UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

**FIRST BAPTIST CHURCH OF IOWA LOUISIANA**                    CASE NO.  2:21-CV-02472

**VERSUS**                    JUDGE JAMES D. CAIN, JR.

**CHURCH MUTUAL INSURANCE CO S I**    MAGISTRATE JUDGE KAY

## TRIAL OPINION

The Court presided over a bench trial of this matter from May 30, 2023, until June 1, 2023.  Post-trial briefs were ordered and have now been submitted.

## INTRODUCTION

Plaintiff, First Baptist Church of Iowa (hereinafter referred to as "First Baptist" or the "Church") owns property in Iowa, Louisiana. On or about August 27, 2020, Hurricane Laura made landfall near Lake Charles, Louisiana causing damage to the Church's property. The property consisted of the main building, which included a sanctuary, fellowship hall, education or classrooms, nursery, kitchen, bathrooms, and offices. There was also a parsonage and a third building, or house.

Defendant, Church Mutual Insurance Company, SI, ("CM") insured the properties during the relevant time period.  The Policy included a blanket policy limit of $1,236,000 for the church building and parsonage as well as all business personal property on those premises. The deductible was 5%, or $61,800. There third building or house was vacant prior to Hurricane Laura; it was separately insured for $65,000 with a $5,000 deductible.

## STIPULATIONS

The parties stipulated that CM made the following payments:[1]

| | | |
|---|---|---|
| October 12, 2020 | $100,000.00 | Advance |
| December 21, 2020 | $ 92,376.50 | Main Building |
| December 21, 2020 | $ 7,774.14 | Parsonage |
| December 21, 2020 | $ 1,924.84 | Building 3 |
| June 22, 2021 | $ 49,107.17 | Main Building |
| July 27, 2021 | $ 8,663.57 | Main Building |
| March 14, 2022 | $ 10,100.00 | Deductible miscalculation |
| March 15, 2023 | $ 10,000.00 | Instit.inc./extra expense |
| March 15, 2023 | $17,936.32 | BPP |
| April 12, 2023 | $41,344.10 | BPP |
| **TOTAL** | **$339,226.64** | |

The parties also stipulated as to the following coverage limits:[2]

| | |
|---|---|
| Main Building[3], parsonage, and BPP[4]/PP[5] (blanket coverage) | $1,236,000 |
| Institutional income and extra expense | $    10,000 |
| Building 3 (gray house) | $    65,000 |

---

[1] Doc. 43-1.
[2] Doc. 43-1.
[3] Sometimes referred to as Church 001.
[4] Business Personal Property.
[5] Personal Property.

## THE DISPUTE

First Baptist contends that CM owes it additional funds for unpaid contractual losses.  In addition, First Baptist maintains that CM mishandled its claim. Specifically, First Baptist contends that CM was in bad faith by failing to pay what the insurance contract obligated it to pay, and that CM failed to make payments timely.  First Baptist is seeking statutory penalties on all amounts unpaid as well as on all payments made because they were also untimely. Finally, First Baptist seeks to recover attorney fees as allowed by law.

## TRIAL TESTIMONY

The following witnesses testified at trial.

*Rachel Gremillion*

 Mrs. Gremillion is a member of the Church; she serves on the Church's disaster committee, the finance committee, and the benevolence committee.  She has been a member of the Church for seven (7) to eight (8) years and was involved with the Church both pre and post Hurricane Laura.  Mrs. Gremillion explained that the main church building was in full working order prior to the Hurricane, but parts of it were not being used pre-Hurricane due to COVID restrictions.  She also testified that as of May 30, 2023, only the sanctuary was being used because the remaining building had not been repaired.  The sanctuary was reopened on the Sunday after Thanksgiving in 2022. She further testified that pre-Hurricane Laura, the parsonage was occupied by Pastor Brandon Oliver, with his wife and six (6) children. However, the third gray building was not occupied, pre-Hurricane Laura.

Mrs. Gremillion evacuated right before Hurricane Laura struck and returned the day after the storm ended. Mrs. Gremillion visited the Church when she returned and took several photos and observed the damage to the Church's main building, both inside and outside. Mrs. Gremillion testified that there was lots of standing water, water damage, cracked windows, fallen ceiling and insulation, bubbled paint, broken light fixtures, and roof damage, including holes in some areas of the roof.[6] Mrs. Gremillion also testified that the columns on the front of the porch had shifted and/or had moved.

Mrs. Gremillion was also the contact person/point person with Church Mutual and/or its representatives. She met with the CM adjuster Wesley Ellis on September 7, 2020, who inspected the Church properties. Mrs. Gremillion met with Bret O'Steen of Young & Associates, and Mike Fink with Engle Martin, who was hired by CM.

After his visit on September 7, 2020, Mr. Ellis estimated that the claim exceeded $600,000. The Claim Notes reflect that there was significant damage to the main building's roof, which would require replacement, and significant damages to the interior, electrical, insulation, drywall, tile flooring, carpet and business personal property ("BPP").[7] Mr. Ellis informed Ms. Gremillion that he would not be handling the claim because he did not handle large losses.

On October 26, 2020, Mrs. Gremillion met with Mr. O'Steen to inspect the damage to the Church property; in March 2021, she met with Mr. Fink. ServPro was

---

[6] Exhibit P-38.
[7] Exhibit P-9.

hired to perform mitigation services and had completed those services around October 2020.

Mrs. Gremillion testified that because CM was not helping with the claimed loss, the Church disaster committee decided to hire a Public Adjuster ("PA"), Strategic Claims.  The Church executed a contract with Strategic Claims on December 4, 2020.[8] Strategic claims issued an estimate using Xactimate for over $1 million in damages.

On October 12, 2020, CM advanced the Church one payment totaling $100,000. On December 21, 2020, CM issued payment for the Main Building, the parsonage, and Building 3 for a total amount of $102,075.48.

During the process, Mrs. Gremillion realized that CM had not paid them for sales tax. After CM was informed of the error, it issued a payment on July 27, 2021, for the unpaid sales tax for a total of $8,669.57.

First Baptist terminated its relationship with Strategic Claims and hired Mr. Rudie Soileau in August 2021. On March 14, 2022, the Church received a payment from CM for $10,000 due to CM's error in calculating the deductible.

Because the offices in the Main Building had not been repaired due to the lack of funds, Mrs. Gremillion testified that the Church purchased a small portable building and converted it into an office for the pastor to work and prepare his sermons. The Church also rented out other church facilities to hold its Sunday services until it was able to repair the sanctuary.

---

[8] *Id.*

*Mike Fink*

Mr. Fink is the executive general adjuster for Engle Martin, a third-party administrator hired by CM to adjust the claim.  Mr. Fink testified that he was responsible for overseeing First Baptist's claim and report to CM. As noted above, Mr. Ellis, with Engle Martin, inspected the Church property on September 7, 2020; however, for reasons unknown to the Court, he prepared an Xactimate estimate solely for the cost of repairing the roof of the parsonage. The immediate advice report dated September 8, 2020, signed by both Mr. Ellis and Mr. Fink, estimated the loss was approximately $630,000.00 before deductibles.[9]

Mr. Fink provided the following narrative as to the damages sustained by the Church and the parsonage:

**LOSS DESCRIPTION:**

**Hurricane Laura Cat-50.** On August 26, 2020, the insured's property suffered significant wind-related damages to the Church and Sanctuary and the Pastor's dwelling.

Regarding the church, the wind damaged the roofs, fascia, soffits, brick walls, and there is water intrusion throughout the entire building.

Regarding the dwelling, the roofing shingles were blown off on all slopes, which the insured has since tarped.  The water affected the ceilings, walls, and flooring in the den, living room, dining room, hallway, and two bedrooms.

*** 

**Building:**

---

[9] P-17.

During our initial site inspection, we inspected the Church/Sanctuary and the Pastor's dwelling.

Below is an overview of the damages per location. During our inspection, the insured had tarped the exposed roofs but had not completed mitigation efforts.

## 1.  Church and Sanctuary:

The Front and rear elevations displayed structural cracks into the brick elevations. The roofing system may require the use of an engineer to investigate and confirming no structural issues.

o   Roof: The wind caused significant damages to the shingle and flat roofing system. Specifically, the flat roof was [blown] off, allowing water to pour through the sheathing and soaking the interior throughout most of the building. The steeple requires repairs.
o   Front Elevation: The wind blew off the pain ted fascia and soffit and dislodged a pillar on the porch near the entry to the building. There appears to be structural damage to the dislodged pillar, which we observed cracks in the brick elevation.

o   Right Elevation: The wind damaged the fascia and soffit, windows, screens, and potentially the HVAC units.

o   Rear Elevation: The wind damaged the fascia and soffit, windows, screens, and we observed a crack in the brick elevation wall.

o   Left Elevation: The wind damaged the fascia and soffit, windows, screens, and potentially the HVAC units.

o   Interior: As observed in our images, the water damaged the ceiling tiles, insulation, fluorescent lights, crown molding, drywall on the walls and ceilings, paneling, cabinets, appliances, baseboards, doors, window trim, and the flooring, including the carpet, pad, VCT, and laminate. The saturated drywall and insulation have fallen to the floors and on top of Business Personal Property.

We are unsure of the damages to the HVAC units and the furnace. However, the furnace is located on the right elevation between the men's and women's restrooms, where water poured into this space.

**2.  Pastor's Dwelling:**

o  Roof: The roof requires the removal and the replacement of the shingles. The Insured provided an estimate from Southwest Maintenance & Construction totaling $9,195.33, including the shingles, drip edge, starter strip, pipe jacks, and exhaust caps (2). We completed a comparative estimate for the above roof repairs totaling $8,481.71, not including the consideration of Overhead & Profit. Based on the availability of the contractor, **we recommend accepting the bid of $9,195.33.**

o  Front Elevation: The painted wood soffits, fascia, and shutters require repairs.

o  Rear Elevation: We are unsure of any damages to the HVAC units since the power had not been restored during our visit. There is damage to the fascia and soffits.

o  Right Elevation: The fascia, soffit, and siding require cleaning and painting.

o  Left Elevation: There is damage to the painted fascia of the rakes and the painted soffit and siding.

o  Living Room: The ceilings insulation, acoustic tiles, painted crown molding, the drywall on the walls and possibly the paneling, painted baseboards, and laminate flooring.
o  Den: The ceilings insulation, acoustic tiles, painted crown molding, the drywall on the walls, and possibly the paneling, painted baseboards, and laminate flooring.

o  Dining Room: The baseboards and the laminate flooring.

o  Hallway: The baseboards and the laminate flooring.

o  Bedroom One: The ceilings, acoustic tiles, insulation, drywall, painted baseboards, carpet, and pad.

o  Bedroom Two: The ceilings, acoustic tiles, insulation, drywall, painted baseboards, carpet, and pad.

**Business Personal Property:**

As observed in our photos, water poured into from the exposed roofing systems damaging the drywall, acoustic ceiling tiles, and insulation, which in addition to the water, fell onto the Insured's Business Personal Property, including desks, chairs, books, tables, toys, cabinets, schooling items, games (soccer table, etc.), window treatments, furniture, and appliances. [10]

This report also stated that the Net Estimate of Loss was $560,150.00 after applying the deductible.[11]

Mr. Fink sent CM a report/estimate signed by Mr. Fink and Mr. Ellis[12] on September 22, 2020. Due to the large loss estimate in excess of $500,000.00, Mr. Ellis was taken off the claim and replaced by Mr. Fink.  Mr. Fink also contacted CM and requested authorization to retain Young & Associates and Bret O'Steen to assist in adjusting the claim. Engle Martin also coordinated any needed experts such as Young & Associates and EFI Global Inc. for engineering services on the environmental and structural side.

Through Mr. Fink's testimony, the following Engle Martin Reports were admitted, which outline the estimated damages and recommendations Mr. Fink made for payment to First Baptist:

| DATE | ESTIMATE OF LOSS | | RECOMMENDED | PAYMENT DATE | | ADJUSTER |
|------|------------------|--|-------------|--------------|--|----------|
| 09-08-20 | Building - <br> Contents - <br> Business Interruption <br> Total <br><br> Net Estimate of loss Less <br> deduct./deprec. | $450,000 <br> $150,000 <br> $ 30,000 <br> $630,000 <br><br><br> not calculated | NONE | Advance <br> 10/12/20 | $100,000.00 | Ellis[13] |
| 11-20-20 | Building - | $450,000 | $219,707.02 | 12/12/20 | $102,075.48 | Fink[14] |

---

[10] Doc. 45-14, P-19, pp. 4 – 6.

[11] *Id.*
[12] Plaintiff's exhibit 19.
[13] P-17.
[14] P-21.

| | | | | |
|---|---|---|---|---|
| | Contents -                $150,000<br>Business Interruption   $  30,000<br>Total                         $630,000<br><br>Net Estimate of loss Less<br>deduct./deprec.          $460,150 | +$10,000.00 for temporary office space | Main building, parsonage and 3rd building | |
| 12-30-20 | Building -                  $450,000<br>Contents -                $150,000<br>Business Interruption   $  30,000<br>Total                         $630,000<br><br>Net Outstanding       $358,074.52 | NONE | | Fink[15] |
| 04-09-21 | Building -                  $450,000<br>Contents -                $150,000<br>Business Interruption   $  30,000<br>Total                         $630,000<br><br>Net Outstanding       $358,074.52 | NONE | | Fink[16] |
| 05-18-21 | Building -                  $450,000<br>Contents -                $150,000<br>Business Interruption   $  30,000<br>Total                         $630,000<br><br>Net Outstanding       $358,074.52 | NONE | | Fink[17] |
| 06-18-21 | Building -                  $450,000<br>Contents -                $150,000<br>Business Interruption   $  30,000<br>Total                         $630,000<br><br>Net Outstanding       $358,074.52 | $39,107.17 for mitigation[18] | 06/22/21  $49,107.17 Main Building | Fink[19] |
| 07-23-21 | Building -                  $450,000<br>Contents -                $150,000<br>Business Interruption   $  30,000<br>Total                         $630,000<br><br>Net Outstanding       $358,074.52 | $8,663.57 due to failure to provide for sales tax in Young & Associates' estimate | 07/27/21  $8,663.57 Sales tax | Fink[20] |
| 09-01-21 | Building -                  $450,000<br>Contents -                $150,000<br>Business Interruption   $  30,000<br>Total                         $630,000<br><br>Net Outstanding       $358,074.52 | NONE | 03/14/22 $10,100.00 Deductible miscalculation<br>03/15/2023 $10,000.00 Institution income/extra expense | Fink[21] |

---

[15] P-22.

[16] P-23.

[17] P-24.

[18] Apparently incorrectly applying a depreciation deductible of 20%.

[19] P-25.

[20] P-27.

[21] P-28.

The last report dated September 1, 2021,[22] estimated the loss at $630,000.00.  As of March 15, 2023, CM had paid the Church $279,946.22.

Mr. Fink was not aware of any person from CM who spoke with either Pastor Oliver, Rachel Gremillion, or any other representative of the Church. Mr. Fink visited the Church one time on March 3, 2021. Mr. Fink testified that other than this one visit, no one else from CM ever visited and/or inspected the Church after the Hurricanes. Mr. Fink also testified that the only other person from CM to visit the Church was Mr. Ellis, who only visited the Church once.

Mr. Fink decided that an engineer and construction consultant was necessary because it was a large loss in excess of half a million dollars. Mr. Fink also testified that even though he was an adjuster, he relied on Mr. O'Steen to provide an estimate of the damages. Even though Mr. Fink was capable of preparing an Exactimate estimate, he chose not to do so, and he did not adjust the claim.  Mr. Fink was unable to point the Court to any adjustment of the Church's claim by CM, Engle Martin, or Young & Associates. Instead, CM relied on the estimate of Mr. O'Steen who is a construction consultant and not a licensed adjuster.

Mr. Fink also testified that CM had its own adjusters who handled large losses, but none of these adjusters prepared an Xactimate claim or adjusted the claim.

*Ron Martin*

Mr. Martin was accepted by the Court as an expert in civil engineering with an emphasis in structural engineering.  Mr. Martin inspected the main church building on

---

[22] P-28.

October 1, 2021, and provided a report on February 21, 2023, with a primary focus on the structure of the building. Mr. Martin observed several cracks in the exterior brick veneer, which he attributed to Hurricane Laura. Mr. Martin explained that the cracks were not caused by a sinking slab because the bricks on both the older and newer slab were completely aligned. In other words, if a sinking slab caused the bricks to crack, the brick on the newer sinking slab would have dropped as well. Mr. Martin testified that he relied on the measurement taken by EFI Global.

*Cal Chambers*

Mr. Chambers, a Louisiana licensed adjuster with Damage Assessment & Insurance Consultants, LLC ("DAIC"), testified as an expert in insurance adjusting and construction. Mr. Chambers testified that after visiting and inspecting the Church, parsonage, and gray building on several occasions, he prepared an Xactimate estimate for the damages to return the building to its pre-loss condition. Mr. Chambers reported the total cost estimate without accounting for payments already made and deductibles, as follows:[23]

| | |
|---|---|
| Main Church building including offices and classrooms | $1,020,343.66[24] |
| Parsonage | $    93,395.87[25] |
| Gray Building | $    65,000.00[26] |

Mr. Chambers opined that replacing the brick veneer as opposed to repairing would restore the Church to its pre-loss condition. Mr. Chambers explained that due to the number of cracks and cracked brick, it would be more economical to replace the

---

[23] P33, Doc. 45-21.
[24] P-33.
[25] P-33.
[26] ($96,990.00 - $5,000 deductible with a policy limit of $65,000)

bricks to pay for the labor it would cost to remove only the damaged bricks and repair the cracked areas.

*Ricardo-Fierro Stevens*

Mr. Stevens was tendered as a civil engineer. Mr. Stevens visited and inspected the cracks in the brick on the southwest corner of the Church in March of 2023, and submitted a report on March 7, 2023. Mr. Stevens opined that the northwest corner of the slab dropped and caused the brick veneer to crack.

*Bret O'Steen*

Bret O'Steen, with Young & Associates, was hired by CM and accepted as a construction consultant; Mr. O'Steen is not a licensed adjuster. Mr. O'Steen visited and inspected the Church in September of 2020 and again in March 2021. Mr. O'Steen prepared an estimate on all three of the Church properties (main church building, parsonage, and gray building).  Mr. O'Steen estimated the damages as follows:

| DATE | MAIN BUILDING | PARSONAGE | GRAY BUILDING |
|------|---------------|-----------|---------------|
| 09/28/2020 | $244,984.16[27] | | |
| | | | |
| 10/14/2020 | | $19,780.17[28] | $8,656.05[29] |
| 11/12/2021 | $298,845.63[30] | | |
| 06/17/2021 | $313,190.17[31] | | |
| 07/13/2021 | $324,019.63[32] | | |

Mr. O'Steen explained why there was such a considerable difference in his Xactimate report compared to Mr. Chamber's report. He explained the difference in his

[27] D-13A.
[28] D-14.
[29] D-15.
[30] D-13B.
[31] D-13C.
[32] D-13D.

estimate was because he did not include replacing the bricks veneer and he used a price list from September 2020 as opposed to Mr. Chambers' January 2023 price list.[33]

Regarding the parsonage, Mr. O'Steen explained that the difference was because he did not include any repair to the exterior of the parsonage, specifically, he did not include pressure washing the exterior, painting the facia, shutters, and doors, and removing the storm door assembly. In addition, Mr. O'Steen did not include repairs for areas of interior and exterior damage that was detailed in Mr. Fink and Mr. Ellis' and Mr. Chambers Xactimate reports.

With regard to his estimate of damage to the gray building, Mr. O'Steen explained that he only included damage to the roof, and nothing was included for interior damage. Mr. O'Steen testified that it was difficult to determine the interior damage because of its condition.

*Brandon Oliver*

Pastor Oliver is the pastor of First Baptist.  He testified that he and his family live in the parsonage. The family evacuated right before the Hurricane, but Pastor Oliver returned two (2) days after the storm struck. Pastor Oliver observed all of the damage to the Church properties.

Pastor Oliver was not involved in the handling the claim. Instead, he formed a committee to handle the Hurricane claim. Because the sanctuary was not accessible due to damage, the Church was able to rent other churches and hold their Sunday services in

---

[33] Mr. O'Steen admitted that he had not updated the price list even though prices for materials have increased since September 2020.

the afternoon.  The Church purchased a metal building and converted it to an office for Pastor Oliver, and rented a storage building to store his family's personal belongings for about a month. Then the building was utilized by the Church for storage of its personal belongings.

Pastor Oliver also testified that he and Mr. O'Steen walked the perimeter of the buildings together and observed the cracks in the brick.  Pastor Oliver informed Mr. O'Steen that he had not seen those cracks before.

*Dorothy Johnston*

Mrs. Johnston has been a member of the First Baptist Church for 25 years.  She is also the treasurer of the Church and responsible for collecting tithes, making deposits, paying bills, and running reports to provide to the finance committee.

Mrs. Johnston testified that the Church had used much of its savings to make repairs to the Church, and that the Church had used all the funds provided by Church Mutual to make repairs. Mrs. Johnston also testified and confirmed the payments to other churches for use of their facilities. She also confirmed that the storage rental was used by the Pastor and the Church to store their belongings.

*Bethany Oliver*

Mrs. Oliver is Pastor Oliver's wife and the mother of their six (6) children. She testified that she returned home after evacuating for Hurricane Laura about one week prior to Hurricane Delta making landfall. Mrs. Oliver testified that a friend of the family took pictures of the parsonage shortly after Hurricane Laura, which revealed a lot of

water in the home. When she returned home, some repairs had been done, but there were still a significant number of repairs that needed to be completed.

*John Kubant*

Mr. Kubant is the senior claims supervisor for Church Mutual. Mr. Kubant explained the process that Church Mutual goes through to adjust a claim, including the use of a third-party administrator ("TPA") once the claim was made by the Church. Mr. Kubant was assigned the claim in April of 2021, because the prior adjuster resigned.

Mr. Kubant testified about some of the errors Church Mutual made with regard to miscalculating the deductible, the sales tax, not paying the $10,000 extra expense timely (it was paid about 1 ½ years late) and using the wrong deductible for contents ($7,500 as opposed to $1,000). He also testified that there was a $12,000 mistake on the Statement of Loss, which amount should be paid to the Church due to CM depreciating the invoice paid by the Church to Servpro for mitigation work. As of the date of the trial, this amount had not been paid.

Mr. Kubant explained that in August 2021, when the instant lawsuit was filed, the claim was reassigned to the legal department. Mr. Kubant also testified that because this was a large loss in excess of $500,000.00, it was necessary to hire a construction consultant and an engineer.

In addition, the claim notes indicate that Mr. Fink visited the Church and noted that 90% of the repairs had been completed. Even though Mr. Fink only visited the Church in March 2021, this claim note was dated a month prior to that visit, and the

Church had not been 90% repaired. Mr. Kubant could not explain how this error was made.

Mr. Kubant testified that it was common practice for Church Mutual to hire a construction consultant to adjust a claim.  However, the Court notes that Mr. O'Steen testified that he did not adjust claims and that he was not a licensed adjuster.

Mr. Kubant also testified that reserves change over time and that a reserve is money put aside to the pay the claim.  The Court questioned Mr. Kubant as to why the reserve on this claim decreased despite that each report issued reflected the same $630,000 reserve amount. Mr. Kubant was unable to respond.  Mr. Kubant did not adjust the claim and the Court notes that there is no evidence in the record to indicate that CM ever adjusted this claim. The evidence and Mr. Kubant's testimony reflects that there was no further adjusting of the Church's claim by CM and/or any of its representatives as of the reinspection in March of 2021.

*Deposition testimony of Dylan Guidry[34]*

Mr. Guidry is a licensed electrician who prepared a bid for electrical work to be performed at the Church for two projects. One project was to install electricity for Pastor Oliver's temporary office and the other project included the main Church sanctuary. Mr. Guidry explained the work he performed on both projects at the Church.

## **EXHIBITS**

*Exhibits listed in documents 45 and 46 of the record.*

---

[34] Doc. 45-19.

## FINDINGS BY THE COURT

After considering all of the testimony and exhibits, the Court finds that CM grossly mishandled First Baptist's claim.  The record clearly exposes CM's failure to adjust the claim.  CM made numerous errors and mistakes as noted herein. CM failed to pay the Church what was due under the policy, and every payment it made was untimely. The Court finds that CM had notice of the proof of loss on September 8, 2020, the date of the first Engle Martin Report.[35]  That report estimated the total loss to be $630,000 and noted the significant damage to the Church properties. Louisiana Revised Statute 22:1892 obligates the insurer to make payment within 30 days of proof of loss. Thus, CM's Advance of $100,000 made on October 12, 2020, was untimely, as well as all subsequent payments. See *French v. Allstate Indemnity Company*, 637 F.3d 571 (5th Cir. 4/4/2011) ("If part of a claim for property damage is not disputed, the failure of the insurer to pay the undisputed portion of the claim within the statutory delay will subject the insurer to penalties on the entire claim." *Grilletta v. Lexington Insurance Co.*, 558 F.3d 359 (5th Cir. 2009) (quoting *Sher v. Lafayette Ins. Co.*, 973 So.2d 39, 60 (La.App. 4 Cir. 2007)).

Based on the evidence at trial, the Court finds that the Engle Martin Report grossly under adjusted the claim. The Court finds that the estimate prepared by Mr. Chambers to be the only credible adjustment made by a Louisiana licensed adjuster. The Court accepts Mr. Chambers' estimate as the covered damages CM was obligated to pay under the policy, with some adjustments that will be discussed below.

---

[35] P-17.

The Court further finds based on the evidence presented at trial, that CM's handling of the claim was arbitrary and capricious, and therefore in violation of Louisiana Revised Statute 22:1892. As such, First Baptist is entitled its unpaid losses, statutory penalties, costs, and attorney fees.

The Court addresses and calculates those losses, statutory penalties, and attorney fees as follows.

CM complains about the DAIC estimate which claims $72,972.79 for HVAC repair work, $10,199.72 charge for "TRAUMA/CRIME SCENE REMEDIATION" and a charge of $2,588.00 for "SWIMMING POOLS & SPAS" for Building.[36] However, these complaints are made solely in CM's post-trial brief but were not challenged at the trial of this matter. CM relied exclusively on Brett O'Steen's estimate, which this Court does not accept nor find credible.

CM contends that DAIC estimated the main Church building roof to be $147,342.17,[37] but argues that the actual roofing invoice that was paid, was only $84,850.00.[38] However, the Court has reviewed the DAIC Xactimate estimate, for the pages cited and notes that the estimate for the roofs on the main Church building, is for $116,328.06,[39] not $147,342.17. However, Mr. Chambers estimate does not include the $21,308.00 invoice paid to Crest Exteriors, LLC,[40] for the temporary roof. Thus the DAIC Xactimate Estimate should be reduced by the difference in the estimate of

---

[36] *Id.*
[37] citing P-33, Page ID # 442-443, 445-446 (Doc. 45-21).
[38] P-49, Doc. 45-4.
[39] P-33, **Total: Roof,** Page ID# 446, Doc. 45-21.
[40] P-48, Doc. 45-3.

$116,328.06 and the actual invoice of $84,500.00 paid.  However, Plaintiff is entitled to be reimbursed for the cost of the temporary roof, which was paid ($21,308.00).  Thus, the estimate should be reduced by a total of $10,520.06.[41]

In that same regard, the Xactimate estimate reflects $11,608.25 to replace the roof on the parsonage. The Southwest Maintenance & Construction, LLC invoice[42] shows that $9,195.33 was paid on 09/17/2020. Thus, the estimate should likewise be reduced by $2,412.92.

Mr. Chambers acknowledged at trial that there was a $3,000.00 miscalculation in his Xactimate estimate based on the size of a tree, which was later determined to actually be a limb.[43] Consequently, Mr. Chamber's Xactimate estimate will be reduced by $3,000.00.

The Court calculates the UNPAID LOSSES as follows:

| | | | |
|---|---|---|---:|
| Church Building | | | $1,020,343.66 |
| Parsonage | | | 93,395.87 |
| Less 5% Deductible | | | (61,800.00) |
| Less roof invoice paid adjustment + temporary roof paid | | | (10,520.06) |
| Less parsonage roof invoice paid adjustment | | | (2,412.92) |
| Plus tree v limb removal and damage | | | (3,000.00) |
| | | | |
| SUBTOTAL | | $ | 1,042,006.57 |
| Less amounts paid | Advance | 10/12/2020 | (100,000.00) |
| | Main Church | 12/21/2020 | ( 92,376.50) |
| | Parsonage | 12/21/2020 | ( 7,774.14) |
| | Main Church | 06/22/2021 | ( 49,107.17) |
| | Main Church | 07/27/2021 | ( 8,663.57) |
| | Deductible | 03/14/2022 | ( 10,100.00) |
| **SUBTOTAL** | | | **$767,985.19** |

---

[41] $116, 328.06 − 84,500.00 = $31,828.06 reduction; $31,828.06 − 21,308.00 = $10,520.06.
[42] P-47.
[43] Tr. P. 350.

| | | |
|---|---|---|
| Building 3 | | $96,990.63 |
| Less Deductible | | (5,000.00) |
| SUBTOTAL | | 91,990.63 |
| **POLICY LIMIT** | | **$65,000.00** |
| Less amount paid | 12/21/2020 | (1,924.84) |
| **SUBTOTAL** | | **63,075.16** |
| | | |
| Business Personal Property | | $100,140.16 |
| Contents | | 12,027.80 |
| Less amount paid | 03/15/2023 | (17,936.32) |
| | 04/12/2023 | (41,344.10) |
| **SUBTOTAL** | | **$   52,887.54** |
| | | |
| **TOTAL UNPAID LOSSES** | | **$ 883,947.89** |

The Court calculates the PENALTIES as follows:

| | | |
|---|---|---|
| Church Building and Parsonage less adjustments | **$** | 1,036,006.57 |
| Building #3 | | 65,000.00 |
| Contents | | 12,027.80 |
| Business Personal Property | | 100,140.16 |
| TOTAL | $ | 1,213,174.53 |
| | | X 50% penalty |
| **TOTAL PENALTY** | **$** | **606,587.27** |

The Court calculates the ATTORNEY FEES as follows:

| | | |
|---|---|---|
| TOTAL UNPAID LOSSES | **$** | **883,947.89** |
| TOTAL PENALTY | **$** | **606,587.27** |
| LOSSES AND PENALTY | **$** | **1,490,535.16** |
| | | X 30% Fee |
| **TOTAL ATTORNEY FEES** | **$** | **447,160.55** |
| | | |
| **TOTAL AWARD** | **$** | **1,937,695.71**[44] |

**COSTS**

---

[44] $883,947.89 + 606,587.27 + 447,160.55 = $1,937,695.71

First Baptist is also entitled to its costs for pursuing its claim to trial. Accordingly, the Court will address the costs after First Baptist submits a detailed summary of costs supported with invoices.

## **CONCLUSION**

This Court is concerned with Church Mutual's handling of insurance claims, or for the lack of better terms, their repeated mishandling of claims and failure to resolve claims.  The Court has observed that of all the insurance carriers that proceed through the Court's Case Management Order, Church Mutual settles the least number of cases pre-certification--only approximately 20%--whereas the majority of cases settled pre-certification by other insurance carriers range from approximately 80-100%.  The Court finds that Church Mutual has established a pattern of systemic failure to resolve insurance claims during the Streamlined Settlement Process.

For the reasons set forth herein, the Court will enter judgment in favor of First Baptist Church of Iowa and against Church Mutual Insurance Company S.I. for a total award of $1,937,695.71.

**THUS DONE AND SIGNED** in Chambers on this 10th day of July, 2023.

**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**